# No.15-2997

---

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

---

**JOHN DOE,**

**Plaintiff-Appellee**

**v.**

**MIDDLEBURY COLLEGE,**

**Defendant-Appellant**

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF VERMONT**
**No. 1:15-cv-00192-jgm (Hon. J. Garvan Murtha)**

---

**BRIEF FOR APPELLANT**

---

Ritchie E. Berger, Esquire
Karen McAndrew, Esquire
DINSE, KNAPP & McANDREW, P.C.
209 Battery Street
Burlington, VT 05402-0988
(802) 864-5751
rberger@dinse.com
ATTORNEYS FOR APPELLANT

October 14, 2015

# <u>CORPORATE DISCLOSURE STATEMENT</u>

Appellant Middlebury College makes the following corporate disclosure pursuant to Fed. R. App. P. 26.1(a):

Middlebury College is a Vermont not-for-profit institution of higher education and does not issue publicly traded stock.

# <u>TABLE OF CONTENTS</u>

CORPORATE DISCLOSURE STATEMENT .................................................i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES .................................................................iv

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF THE ISSUES .............................................................1

STATEMENT OF THE CASE .................................................................2

    I.      STATEMENT OF FACTS ..............................................3

         A.     Background.............................................................3

         B.     Middlebury's Response to the Allegation Against Plaintiff................................................................3

         C.     Middlebury's Investigation .........................................5

    II.     PROCEEDINGS BELOW ..............................................7

SUMMARY OF THE ARGUMENT ........................................................9

STANDARD OF REVIEW ..................................................................12

ARGUMENT ....................................................................................13

    I.      THE DISTRICT COURT ERRED IN FINDING THAT PLAINTIFF MADE AN ADEQUATE SHOWING OF POTENTIAL SUCCESS ON THE MERITS TO WARRANT A PRELIMINARY INJUNCTION. ........................13

         A.     The District Court Erred in Applying the "Serious Questions" Prong. ................................................14

         B.     Plaintiff Did Not Show Any Possibility of Success on the Merits. .......................................................18

             1.     Middlebury's Handbook Indisputably Authorizes Disciplinary Action Based on Off-Campus Conduct. .......................................19

             2.     Middlebury's Pre-Departure Handbook Does Not Restrict Its Authority to Investigate and Discipline Students for Off-Campus Sexual Misconduct. ...............................................21

3. The Acknowledgment and Assumption of Risks and Release Agreement Signed by Plaintiff Has No Impact on the Scope of Middlebury's Disciplinary Authority. .................................23

4. Middlebury's Handbook Governing Its Own Study Abroad Programs Provides No Support for Plaintiff's Contract Claim. .................................25

II. THE DISTRICT COURT ERRED IN FINDING THAT PLAINTIFF WOULD LIKELY SUFFER IRREPARABLE HARM IN THE ABSENCE OF A PRELIMINARY INJUNCTION. ................................................................27

III. THE PRELIMINARY INJUNCTION IMPOSES SUBSTANTIAL HARDSHIP ON MIDDLEBURY .....................30

CONCLUSION ..............................................................................................33

CERTIFICATE OF COMPLIANCE ............................................................35

CERTIFICATE OF SERVICE ......................................................................36

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Aircraft Mechanics Ass'n v. Atlantic Coast Airlines, Inc.*, 55 F.3d 90
   (2d Cir. 1995) ...................................................................13

*Baer v. National Bd. of Medical Examiners*, 392 F. Supp. 2d 42
   (D. Mass. 2005) ...............................................................29

*Ben-Yonatan v. Concordia Coll. Corp.*, 863 F. Supp. 983 (D. Minn. 1994)..........29

*Caiola v. Saddlemire*, No. 3:12-CV-00624 (VLB), 2013 WL 1310002
   (D. Conn. Mar. 27, 2013) .................................................29

*Cayuga Indian Nation of New York v. Seneca Cnty., N.Y.*, 761 F.3d 218
   (2d Cir. 2014) ...................................................................12

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master
   Fund Ltd.*, 598 F.3d 30 (2d Cir. 2010) ..............................16

*Diamond "D" Constr. Corp. v. McGowan*, 282 F.3d 191 (2d Cir. 2002) ..............12

*Fellheimer v. Middlebury Coll.*, 869 F. Supp. 238 (D. Vt. 1994) ................... 18, 19

*Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112 (2d Cir. 2005) ...........................28

*Gen. Elec. Co. v. New York State Dep't of Labor*, 891 F.2d 25 (2d Cir. 1989) ......13

*Guitard v. United States Sec'y of Navy*, 967 F.2d 737 (2d Cir. 1992) ...................28

*Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738 (2d Cir. 1953) ..............16

*John A. Russell Corp. v. Bohlig*, 739 A.2d 1212 (Vt. 1999) ...................................17

*Knelman v. Middlebury Coll.*, 570 F. App'x 66 (2d Cir. 2014) ................. 18, 22, 24

*Knelman v. Middlebury Coll.*, 898 F. Supp. 2d 697 (D. Vt. 2012)
   (2d Cir. 2014) ...................................................................19

*Krizek v. Cigna Grp. Ins.*, 345 F.3d 91 (2d Cir. 2003) ..............................................32

*Loveridge v. Pendleton Woolen Mills, Inc.*, 788 F.2d 914 (2d Cir. 1986) ..............28

*Martin v. Shepard*, 365 A.2d 971 (Vt. 1976)..............................................................22

*Mazurek v. Armstrong*, 520 U.S. 968 (1997)......................................................... 9, 15

*New York v. Nuclear Regulatory Comm'n*, 550 F.2d 745 (2d Cir. 1977) ..............15

*Nken v. Holder*, 556 U.S. 418 (2009) ............................................................... 12, 17

*Reynolds v. Sterling Coll., Inc.*, 750 A.2d 1020 (Vt. 2000)....................................18

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56 (1st Cir. 2005) ..........28

*Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.*, 157 F.3d 174
  (2d Cir. 1998) ..............................................................................................16

*Rogers v. Wells*, 808 A.2d 648 (Vt. 2002)................................................................25

*Russell v. Salve Regina Coll.*, 890 F.2d 484 (1st Cir. 1989) ...................................30

*Sampson v. Murray*, 415 U.S. 61 (1974) ..................................................................28

*Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253 (Fed. Cir. 2012) ........................15

*Stockstill v. Quinnipiac Univ.*, No. 3:10-CV-265 (VLB), 2010 WL
2011152 (D. Conn. May 19, 2010).................................................................... 29, 31

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .................................16

*Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101 (2d Cir. 2003) ........28

*Xpressions Footwear Corp. v. Peters*, No. 94 CIV. 6136 (JGK), 1995 WL
  758761 (S.D.N.Y. Dec. 22, 1995) .......................................................................23

*Zervos v. Verizon New York, Inc.*, 252 F.3d 163 (2d Cir. 2001) ..................... 12, 14

*Zino Davidoff v. CVS Corp.*, 571 F.3d 238 (2d Cir. 2009)......................................14

**Statutes**

18 U.S.C. § 1292(a)(1)................................................................1

20 U.S.C. § 1681........................................................................1

28 U.S.C. § 1331........................................................................1

28 U.S.C. § 1332........................................................................1

## JURISDICTIONAL STATEMENT

The District Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1332.  Appellee-Plaintiff John Doe is domiciled outside the State of Vermont, Middlebury College ("Middlebury" or the "College") is domiciled in Vermont, and, if successful, Plaintiff's claim for damages could exceed the threshold established by 28 U.S.C. § 1332.  Plaintiff's Complaint also includes a claim under 20 U.S.C. § 1681, therefore raising a federal question under 28 U.S.C. § 1331.

This is an interlocutory appeal from a preliminary injunction issued by the United States District Court for the District of Vermont on September 16, 2015.  Middlebury College filed its Notice of Appeal on September 23, 2015.  This Court has jurisdiction to hear this appeal pursuant to 18 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1.      Did the District Court err in concluding that Plaintiff satisfied his burden of showing sufficiently serious questions as to the merits of his breach of contract claim to make them fair ground for litigation?

2.      Did the District Court err in finding that Plaintiff met his burden of showing that he would likely suffer irreparable harm in the absence of a preliminary injunction?

3.  Did the District Court err in finding that the balance of hardships tips decidedly in Plaintiff's favor?

## STATEMENT OF THE CASE

Appellant-Defendant Middlebury College appeals from the grant of a preliminary injunction issued after a non-evidentiary hearing by the United States District Court for the District of Vermont (Murtha, J.) ordering that Middlebury readmit for the fall 2015 semester Appellee-Plaintiff, a student who was expelled after the College found him responsible for violating its sexual misconduct policy. Plaintiff brought this action against the College alleging breach of contract, breach of the covenant of good faith and fair dealing and violation of Title IX of the Education Amendments of 1972. Plaintiff also included a request for preliminary injunctive relief, which the District Court granted on September 16, 2015, finding that: (1) Plaintiff would likely suffer irreparable harm if not reinstated pending a final determination on the merits; (2) Plaintiff presented a sufficiently serious question going to the merits of his contract claim to make it fair ground for litigation; (3) the balance of hardships tipped decidedly in Plaintiff's favor; and (4) the public interest did not strongly weigh in favor of denying the motion for preliminary injunction.

## I.     STATEMENT OF FACTS

### A.     Background

Plaintiff enrolled as a student at Middlebury College in the spring 2013 semester.  Appendix ("App.") at 9.  During the spring 2014 semester, Plaintiff applied, through Middlebury's Office of International Programs, for approval to study abroad for the fall semester 2014.  *Id.*  Plaintiff separately applied to a study abroad program operated by another institution, the School for International Training ("SIT").  *Id*. at 9-10.  Middlebury granted Plaintiff permission to study abroad, SIT approved Plaintiff's application, and he attended the SIT program in the fall 2014 semester.  *Id*. at 11.  Although the program was administered by SIT, the academic credits awarded were expected to count toward Plaintiff's degree at Middlebury.  *Id*. at 139.

In November 2014 while attending the SIT program, a fellow SIT (non-Middlebury) student ("Jane Doe") reported that Plaintiff had sexually assaulted her while she was asleep.  *Id*. at 12, 189.  After a brief investigation and hearing, SIT concluded that Plaintiff was not responsible.  *Id.* at 15.  Middlebury was notified of that outcome on December 11, 2014.  *Id*. at 189.

### B.     Middlebury's Response to the Allegation Against Plaintiff

Shortly before Middlebury received notice of the outcome of the SIT hearing, the Title IX Coordinator from the university that Jane Doe attends

3

contacted Middlebury and explained that Jane Doe had many complaints about SIT's process and wanted Middlebury to investigate her report of misconduct by Plaintiff. *Id*. at 189-90. Jane Doe later contacted the College directly by email and stated her belief that SIT's investigation was "not in depth nor did they interview other students or my academic director," that her "attempts to work through their judicial process in the hope of seeking justice were difficult and [she] was met with many challenges as Title IX procedure was not followed and [she] was further victimized by a process aimed at protecting the individual who attacked [her]." *Id*. at 191. Jane Doe also sent Middlebury documents and photographic images related to her allegations against Plaintiff. *Id*. at 192.

In January 2015, Middlebury decided to investigate the allegations against Plaintiff based on the information that Jane Doe had provided, the serious nature of the conduct she alleged, her perceptions of SIT's investigation and hearing process, and Middlebury policies and precedent. *Id*. at 193-94. Middlebury's College Handbook plainly sets forth its authority to undertake such an investigation. *Id*. at 77, 179. Specifically, Middlebury's Sexual Misconduct, Domestic Violence, Dating Violence and Stalking Policy ("Sexual Misconduct Policy") includes this "Scope of Oversight" provision:

> Students will be held accountable for policy violations that take place
> between the time they first arrive on campus to begin their
> Middlebury program and their graduation or completion of their
> program, or Middlebury's confirmation of their resignation or

4

expulsion. *Conduct that . . . occurs off-campus but may represent a threat to the safety of the Middlebury community or any of its members, the pursuit of its objectives, and/or the educational environment of others, may be subject to Middlebury's disciplinary process.*

*Id*. at 77 (emphasis added). Virtually identical language is included in the Community Standards and Policy Overview section of Middlebury's College Handbook, which governs all student conduct. *Id*. at 179. Pursuant to its broad authority under those provisions, Middlebury determined that the conduct alleged "represent[ed] a threat to the safety of the Middlebury community . . . , the pursuit of its objectives, and/or the educational environment of others," and was, therefore, subject to Middlebury's disciplinary process. *Id*. at 184-85, 193-94. Accordingly, on January 23, 2015, Plaintiff was informed that the College was initiating an investigation into Jane Doe's allegations under its Sexual Misconduct Policy. *Id*. at 194.

## C. Middlebury's Investigation

The Sexual Misconduct Policy in effect at the time called for the College to appoint an individual to conduct an investigation and provide a written report to Middlebury's Human Relations Officer ("HRO"). *Id*. at 71-72, 195. The HRO would then meet with the parties if they desired, review the investigation report and evidentiary materials, and make a determination as to whether the respondent was responsible for policy violations based on the preponderance of the evidence.

5

*Id*. at 72-73, 195. If a student respondent was found responsible, a sanction would be determined by a Middlebury official with jurisdiction over that student. *Id*. at 73, 195. Both the complainant and the respondent had the right to appeal the finding or sanction. *Id*. at 74, 195. If the sanction was expulsion and was upheld in the first-level appeal, the respondent had a right to appeal the sanction to the President of the College. *Id*.

Middlebury retained an attorney with substantial experience investigating allegations of sexual misconduct to investigate Jane Doe's allegations. *Id*. at 196. After conducting a thorough investigation, including interviewing sixteen individuals, the investigator issued her report on July 2, 2015, and recommended a finding that Plaintiff had violated the Sexual Misconduct Policy. *Id*. at 76, 195, 203.

On July 10, 2015, Middlebury's HRO issued a decision concluding, by a preponderance of the evidence, that Plaintiff had violated the Sexual Misconduct Policy. *Id*. at 22, 197. Based on that determination, a sanction of expulsion was imposed on July 24, 2015. *Id*. at 28, 197. Plaintiff exhausted Middlebury's appeal process and, on August 26, 2015, the President of the College upheld the sanction and Plaintiff's expulsion became final. *Id*. at 29, 197.

## II.    PROCEEDINGS BELOW

On August 28, 2015, Plaintiff filed this action, alleging breach of contract, breach of the covenant of good faith and fair dealing, and violation of Title IX of the Education Amendments of 1972. *Id*. at 30-31. At the same time, Plaintiff moved for a preliminary injunction based on his claims for breach of contract and violation of Title IX. *Id*. at 2. Middlebury opposed that Motion, and the District Court heard oral argument on September 15, 2015, but took no evidence. *Id*. at 3-4.

On September 16, 2015, the District Court granted Plaintiff's Motion and ordered that "Middlebury College shall not expel Plaintiff and shall allow him to remain enrolled in his courses for the fall 2015 semester beginning September 16, 2015." *Id*. at 259. The District Court found that Plaintiff would likely suffer irreparable harm in the absence of an injunction, stating that monetary damages would not adequately compensate Plaintiff for "the loss of his senior year in college with his class, the delay in the completion of his degree, . . . the opportunity to begin his career in July 2016 [with the job he had secured pending completion of his degree]," or his need to "explain, for the rest of his professional life, why his education either ceased prior to completion or contains a gap." *Id*. at 255-56.

7

As to Plaintiff's legal claims, the District Court did *not* determine that Plaintiff was likely to succeed on the merits, but instead concluded only that Plaintiff had presented "sufficiently serious questions going to the merits of his breach of contract claim to make them fair ground for litigation." *Id*. at 257. More specifically, relying solely on Plaintiff's allegations and without conducting any analysis of the College Handbook provisions at issue, the District Court concluded that Plaintiff had "demonstrated a sufficiently serious question regarding whether Middlebury violated its policies in conducting a second investigation of the charge of sexual assault against Plaintiff after he was exonerated by one U.S. institution following an investigation and hearing."[1] *Id*. The District Court did not identify what "policy" had been potentially violated by Middlebury, nor did it explain why Middlebury's broad authority to investigate and discipline its students for off-campus misconduct did not apply in this case. *Id*.

The District Court also determined that the balance of hardships decidedly favored Plaintiff, explaining that "it is unlikely Middlebury will suffer great damage or loss as a result of the issuance of a preliminary injunction preventing the expulsion of Plaintiff for the fall semester." *Id*. In assessing the potential harm to Middlebury, the District Court inferred that "Middlebury does not view Plaintiff

---

[1]     The District Court limited this conclusion to Plaintiff's breach of contract claim and its decision did not rest on Plaintiff's Title IX or breach of the covenant of good faith and fair dealing claims. *Id*.

as a threat to the Middlebury community" based on the fact that Plaintiff was permitted to attend classes while the investigation was pending and before a determination of responsibility had been made. *Id*. at 257-58. The District Court also found that "there is no indication that Plaintiff poses a current threat to campus safety" because he had not committed another sexual assault since returning to Middlebury. *Id*. at 258-59.

Finally, although the Court acknowledged that the "public interest lies in maintaining campus safety," it issued the preliminary injunction based on its finding that "the public interest does not strongly weigh in favor of denying the motion for preliminary injunction." *Id*. at 258-59.

Middlebury filed its Notice of Appeal on September 23, 2015. *Id*. at 260. Two days later, Middlebury moved this Court for expedited review, which was granted on October 2, 2015.

## SUMMARY OF THE ARGUMENT

The exceedingly lenient standard applied by the District Court upends the well-settled rule that a preliminary injunction is "an extraordinary and drastic remedy," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997), and effectively makes injunctive relief the rule rather than the rare exception. The District Court's discussion of the merits was essentially a recitation of Plaintiff's assertions followed by a boilerplate conclusion that "serious questions" exist as to his breach

9

of contract claim. As such, the Court reduced Plaintiff's burden on his preliminary injunction motion to a bare notice pleading standard. The District Court conducted no independent analysis of the controlling College Handbook provisions, nor did it address any of the arguments raised by Middlebury—instead, it merely accepted Plaintiff's assertions at face value. Indeed, the District Court failed even to identify what Middlebury policy had potentially been violated.

The lack of any meaningful legal analysis by the District Court is especially problematic given that there is no factual dispute related to Plaintiff's breach of contract claim. Whether Middlebury had authority under its policies to conduct the investigation of Plaintiff is a pure question of law governed entirely by the terms of the College's written policies, which undeniably authorize Middlebury to investigate and discipline students based on their off-campus conduct. On this point there can be no room for doubt. A plain reading of Middlebury's governing policies leads to the inescapable conclusion that the College had the authority to investigate and sanction Plaintiff for his misconduct while attending the SIT program. Neither Plaintiff nor the District Court offered any plausible basis for concluding otherwise.

Nor does the District Court's finding that Plaintiff would likely suffer irreparable harm withstand scrutiny. The primary risk to Plaintiff—the potential loss of a job offer—is compensable by money damages and cannot support a

finding of irreparable harm.  The remaining potential injuries—such as possible adverse consequences resulting from a gap in his academic record—are no different from those that attend any suspension or expulsion from a college or university and present a threat that is purely speculative.  The District Court's finding of irreparable harm, if upheld, would substantially interfere with the ability of Middlebury and other educational institutions to enforce rules of student conduct, as any suspension or expulsion will involve similar potential harm, and would encourage routine requests for judicial intervention in school disciplinary decisions.

Finally, the District Court's analysis of the balance of hardships was fraught with unjustified findings and unwarranted inferences.  The College has both the right and the duty to take those measures it deems appropriate to promote a safe and secure environment for its students.  Requiring the College to readmit Plaintiff after he was found to have committed forcible rape dramatically undermines the College's authority to protect its community, and constitutes an unwarranted intrusion by the Court into matters of campus safety and student discipline.  The District Court's findings that Plaintiff posed no potential threat to the Middlebury community because there was no evidence he had committed another sexual assault since returning to campus, and that the College must not have been

concerned about the threat he posed since it did not immediately expel him before the investigatory process had begun, are manifestly erroneous.

For all of these reasons, the preliminary injunction must be vacated.

## STANDARD OF REVIEW

A district court's decision to grant a preliminary injunction generally is reviewed for abuse of discretion. *Diamond "D" Constr. Corp. v. McGowan*, 282 F.3d 191, 197 (2d Cir. 2002). This does not, however, "mean that no legal standard governs that discretion," and a district court's decision will only be upheld if it is, at a minimum, "guided by sound legal principles." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quotations omitted). "A district court 'abuses' or 'exceeds' the discretion accorded to it when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." *Zervos v. Verizon New York, Inc*., 252 F.3d 163, 169 (2d Cir. 2001).

This Court reviews the "legal conclusions underlying the district court's decision *de novo*." *Cayuga Indian Nation of New York v. Seneca Cnty., N.Y.*, 761 F.3d 218, 220 (2d Cir. 2014). This is particularly true in cases where "no facts are in dispute and the district court's ruling turns solely on an interpretation of the

law," in which case this Court's review is "much broader, and [it] may decide the controlling legal dispute *de novo*, rather than defer that decision until a further appeal which would follow the grant or denial of permanent relief." *Aircraft Mechanics Ass'n v. Atlantic Coast Airlines, Inc.*, 55 F.3d 90, 91 (2d Cir. 1995) (quotations and alterations omitted); *Gen. Elec. Co. v. New York State Dep't of Labor*, 891 F.2d 25, 26 (2d Cir. 1989) ("[I]f we conclude that the district court's denial of plaintiff's motion for preliminary relief was based upon a misinterpretation of law that is basic to the issue of liability and may set a wrongful precedent, we have the power, and perhaps even the duty, to say so.").

## <u>ARGUMENT</u>

## I. THE DISTRICT COURT ERRED IN FINDING THAT PLAINTIFF MADE AN ADEQUATE SHOWING OF POTENTIAL SUCCESS ON THE MERITS TO WARRANT A PRELIMINARY INJUNCTION.

The District Court's ruling on the merits presents a narrow question—did Middlebury's governing policies authorize its investigation of and disciplinary action against Plaintiff? The answer is provided by the plain language of the College Handbook, which firmly establishes, as a matter of law, that Middlebury was empowered to apply its disciplinary process to Plaintiff's conduct based on Jane Doe's allegations even though the conduct occurred off campus. In an effort to sidestep this undeniable authority, Plaintiff advanced a series of arguments resting on contorted interpretations of plainly irrelevant material. More

13

importantly, the District Court ignored the plain language of the College Handbook to reach the conclusion that Middlebury may have violated some wholly unidentified "policy." Applying this Court's *de novo* standard of review, the conclusion that Middlebury had the right to investigate and discipline Plaintiff is inescapable, and the District Court's failure to recognize that is reversible error.

### A. The District Court Erred in Applying the "Serious Questions" Prong.

Preliminary injunctive relief may be issued only upon a showing of: (1) "a likelihood of irreparable harm if the requested relief is denied," and (2) "either (a) a likelihood of success on the merits of [the plaintiff's] case or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor."[2] *Zino Davidoff v. CVS Corp.*, 571 F.3d 238, 242 (2d Cir. 2009).

The District Court did not determine that Plaintiff was likely to succeed on the merits, but instead relied on the "serious questions" prong in issuing the injunction. App. at 257. The District Court misapplied that standard by basing its conclusion solely on Plaintiff's allegations, without evaluating—or even

---

[2]     Although courts ordinarily evaluate the irreparable harm requirement at the outset when reviewing a preliminary injunction decision, it is appropriate to address the merits first where, as here, that element is dispositive. *Zervos*, 252 F.3d at 175. Because the District Court erred as a matter of law in concluding that Plaintiff made an adequate showing of success on the merits, Middlebury addresses that issue first.

mentioning—Middlebury's governing policies. In fact, the District Court's

discussion as to the merits was limited to a paragraph that merely recited Plaintiff's

assertions—without addressing the College's arguments at all—before drawing a

perfunctory conclusion that the "serious questions" standard had been met. The

District Court's failure to engage in independent analysis of the viability of

Plaintiff's breach of contract claim or to address the legal arguments raised by

Middlebury requires reversal. *Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253,

1258 (Fed. Cir. 2012) (stating that a litigant is "entitled to have the district court

make an independent assessment of its defense and apply the proper burden of

proof" before a preliminary injunction may issue) (quoting *Sciele Pharma Inc. v.

Lupin Ltd.*, No. 2012–1118, 2012 U.S. App. LEXIS 2442, at *2 (Fed. Cir. Feb. 6,

2012)). Review of the controlling Middlebury policies establishes that the District

Court's application of the "serious questions" prong is plainly inconsistent with

basic principles governing preliminary injunctions and this Court's precedent.

It is fundamental that "a preliminary injunction is an extraordinary and

drastic remedy, one that should not be granted unless the movant, by a clear

showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968,

972 (1997) (quotation omitted). The movant necessarily "bears a heavy burden,"

*New York v. Nuclear Regulatory Comm'n*, 550 F.2d 745, 750 (2d Cir. 1977), and

must ordinarily establish a "likelihood of success on the merits" in order to obtain

preliminary injunctive relief. *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 21 (2008).

This Court, however, has recognized that a preliminary injunction may issue where the "questions going to the merits [are] so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Hamilton Watch Co. v. Benrus Watch Co*., 206 F.2d 738, 740 (2d Cir. 1953). In *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd*., 598 F.3d 30, 34 (2d Cir. 2010),[3] this Court explained that the "serious questions" prong is designed to accommodate close cases where a court "*cannot determine with certainty* that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Id*. at 35 (emphasis added). Application of this flexible standard is appropriate to address "uncertainties inherent at the

---

[3]     The *Citigroup* Court rejected an argument that the Supreme Court's decision in *Winter*, (which held that the standard for obtaining a preliminary injunction requires the movant to establish that he is "likely to succeed on the merits"), overruled the "serious questions" prong. *Citigroup*, 598 F.3d at 35-36. Middlebury recognizes that "every panel of this court is bound by the decisions of earlier panels," *Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc*., 157 F.3d 174, 176 (2d Cir. 1998), so it will not discuss this aspect of the *Citigroup* holding at length. Middlebury does, however, respectfully submit that *Winter* did effectively overrule the "serious questions" prong, and therefore requests that this Panel reconsider that aspect of the *Citigroup* decision, hold that the moving party must demonstrate a probability of success on the merits in order to obtain a preliminary injunction, and reverse and vacate the District Court's order on that basis.

outset of *particularly complex litigation*." *Id.* (emphasis added). Furthermore,

although this relaxed standard does not require a showing that success on the

merits is "probable," it is not enough for a movant to merely show that its chance

of success is "better than negligible," *id*. at 38 n.7, or only "possible." *Nken v.*

*Holder*, 556 U.S. 418, 434 (2009).[4] Instead, at a minimum, the movant must

demonstrate a "fair chance of success on the merits." *Cf. Republic of the*

*Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (quotation omitted)

(applying a similar "serious questions" standard).

   Here, the undisputed facts and the governing College Handbook provisions

establish that Plaintiff has no chance of success on his claim that Middlebury

lacked authority to conduct its investigation. This is not a complex issue requiring

extensive factual development or application of novel legal theories. To the

contrary, all facts relevant to this issue are uncontested and the outcome depends

solely on an interpretation of Middlebury's policies and application of well-

established and easily applied contract principles. The District Court's reliance on

the "serious questions" prong was therefore erroneous; there is simply no difficulty

in predicting the outcome on the merits with near (if not absolute) certainty at this

stage. *John A. Russell Corp. v. Bohlig*, 739 A.2d 1212, 1216 (Vt. 1999) (holding

---

[4]    Although *Nken* dealt with the standard for issuing a stay, the Court
acknowledged that "[t]here is substantial overlap between these and the factors
governing preliminary injunctions." *Nken*, 556 U.S. at 434.

that interpretation of unambiguous contract provisions is a matter of law to be decided by the court).

### B. Plaintiff Did Not Show Any Possibility of Success on the Merits.

Middlebury's decision to investigate and discipline Plaintiff fell well within the College's broad authority under its policies to take disciplinary action based on a student's off-campus misconduct.[5]  Under Vermont law, the relationship between a student and a private college is contractual in nature.  *Reynolds v. Sterling Coll., Inc.*, 750 A.2d 1020, 1022 (Vt. 2000).  "The terms of the contract are contained in the brochures, course offering bulletins, and other official statements, policies and publications of the institution."  *Id.* (quoting *Merrow v. Goldberg*, 672 F. Supp. 766, 774 (D. Vt. 1987)).  At the same time, "[c]ourts should be wary of the wholesale application of commercial contract principles in the academic context."  *Fellheimer v. Middlebury Coll.*, 869 F. Supp. 238, 243 (D. Vt. 1994).  Not every statement in a college handbook is an enforceable contractual provision: courts will enforce only "specific and concrete" provisions.  *Knelman v. Middlebury Coll.*, 570 F. App'x 66, 67 (2d Cir. 2014) (citing *Reynolds*, 750 A.2d at 1022).  Even

---

[5]     Since the District Court did not provide any specific basis for its conclusion that "serious questions" exist as to whether Middlebury violated its policies—such as which policy was possibly violated or why Middlebury's broad authority under the College Handbook to investigate off-campus misconduct does not control—the arguments made by Plaintiff in his preliminary injunction filings below are addressed here.

18

where a "specific and concrete" provision is found, courts must remain cognizant of the academic setting in which the provision is to be enforced. *Knelman v. Middlebury Coll.*, 898 F. Supp. 2d 697, 709 (D. Vt. 2012) *aff'd*, 570 F. App'x 66 (2d Cir. 2014). With respect to disciplinary actions, a college breaches its obligations to its students "only by deviating from its own procedures in such a way that the disciplinary action at issue is fundamentally unfair, arbitrary or capricious." *Id.* at 710 (quoting *Fellheimer*, 869 F. Supp. at 244) (internal quotation marks omitted).

### 1. Middlebury's Handbook Indisputably Authorizes Disciplinary Action Based on Off-Campus Conduct.

Middlebury's College Handbook establishes the standards and policies governing the conduct expected of its students, and the processes by which they may be disciplined. Middlebury's regulation of its students' conduct is not limited to the territorial boundaries of the College's campus—rather, the Handbook, in plain and unambiguous terms, confers to the College broad authority to investigate and discipline students for activities that take place off campus. The Community Standards and Policy Overview ("Community Standards Policy") section of the College Handbook, which governs all student conduct, provides that:

> Students will be held accountable for policy violations that take place between the time they first arrive on campus to begin their Middlebury program and their graduation or completion of their program, or Middlebury's confirmation of their resignation or expulsion. *Conduct that . . . occurs off-campus but may represent a*

> *threat to the safety of the Middlebury community or any of its*
> *members, the pursuit of its objectives, and/or the educational*
> *environment of others, may be subject to Middlebury's disciplinary*
> *process.*

App. at 179 (emphasis added). Nearly identical language is included in

Middlebury's Sexual Misconduct Policy. *Id.* at 77.

The legal effect of this language, which applies to all Middlebury students

from their first date of attendance forward with no exceptions, including periods

where a student attends an externally sponsored study abroad program,[6] cannot be

seriously disputed. The Handbook policies authorize the College to investigate

and discipline students for misconduct, including sexual misconduct, that occurs

off campus. The decision whether to investigate such matters is committed to the

discretion of the College, which may proceed whenever it determines that the

alleged misconduct may pose a threat to the Middlebury community. The fact that

Plaintiff was also subject to the disciplinary authority of another institution at the

time his misconduct occurred is wholly irrelevant, given the unqualified language

of Middlebury's Handbook.

---

[6]     "Externally sponsored" study abroad programs are programs administered
by a non-Middlebury institution. In contrast, Middlebury also operates and
administers its own study abroad programs. In this case, Plaintiff attended a study
abroad program operated by SIT.

20

**2.    Middlebury's Pre-Departure Handbook Does Not Restrict Its Authority to Investigate and Discipline Students for Off-Campus Sexual Misconduct.**

Faced with the clear language of the College Handbook, Plaintiff argued below that Middlebury's Study Abroad: Pre-Departure Handbook ("Pre-Departure Handbook"), which is a guide distributed by the College to students preparing to attend externally sponsored study abroad programs, restricts Middlebury's power to investigate claims of sexual misconduct occurring while a student attends such a program. But the Pre-Departure Handbook does not even reference the Sexual Misconduct or Community Standards policies, much less expressly limit the College's authority under those policies. Nor does the clearly irrelevant "Honor Code' section of the Pre-Departure Handbook create such a limitation. That section, which applies to academic misconduct committed while participating in another institution's academic program, states:

> All students studying abroad, whether a Middlebury student on an externally sponsored program, or a student from any institution at a Middlebury School Abroad, *are considered Middlebury students and are expected to uphold complete intellectual and academic honesty in the preparation of all academic work and exams.* Violations will be evaluated and discipline will be determined by the externally sponsored program, *or through Middlebury College's academic disciplinary process*, as appropriate.
>
> *Middlebury reserves the right to take disciplinary action upon a student's return to Middlebury*, if deemed appropriate by the Dean of International Programs and the Judicial Affairs Officer, in consultation with others. Students may not seek to appeal at

21

Middlebury any disciplinary procedures determined or conducted by the externally sponsored program or host university.

*Id*. at 141-42 (emphasis added). Plaintiff's argument that this provision empowers Middlebury only to *discipline* a study abroad student based on the external program's finding of misconduct, but leaves the College powerless to independently *evaluate* the alleged misconduct is not, of course, what the plain language provides. In any case, by its express terms, the "Honor Code" provision, as the title indicates, applies only to *academic* honesty issues—not non-academic misconduct such as sexual assault. The District Court could not reasonably infer from the Honor Code language a limitation on Middlebury's authority to exercise its disciplinary authority over sexual misconduct. *Martin v. Shepard*, 365 A.2d 971, 974 (Vt. 1976) (courts will "not read into a contract a term not expressly included unless it arises by necessary implication from the provisions of the instrument"). Finally, the fact that the quoted language does not include a "specific and concrete" statement about the College's authority over sexual misconduct offenses forecloses Plaintiff's argument on this point. *See Knelman*, 570 F. App'x at 67 ( college's general disciplinary processes not applicable to athletic infractions in the absence of a "specific and concrete" statement to that effect).

No reasonable interpretation of the "Honor Code" provision of the Pre-Departure Handbook could support a conclusion that Middlebury forfeited its

22

authority to investigate allegations of sexual misconduct occurring while a student is studying abroad at an externally sponsored program. To the extent the District Court relied on such a conclusion in issuing the preliminary injunction, it erred as a matter of law.

> **3.     The Acknowledgment and Assumption of Risks and Release Agreement Signed by Plaintiff Has No Impact on the Scope of Middlebury's Disciplinary Authority.**

The second contract-based argument Plaintiff made below was that an "Acknowledgment and Assumption of Risks and Release Agreement" (the "Release") that he signed before departing for the SIT program somehow operated to restrict Middlebury's disciplinary authority. App. at 173-77. The purpose of the Release, however, is to *protect Middlebury* from possible claims by dissatisfied students based on incidents that might occur while studying abroad. *See Xpressions Footwear Corp. v. Peters*, No. 94 CIV. 6136 (JGK), 1995 WL 758761, at *6 (S.D.N.Y. Dec. 22, 1995) ("A release is the giving up or abandoning of a claim or right to the person against whom the claim exists or the right is to be enforced or exercised."). Plaintiff's claim that the Release restricts Middlebury's disciplinary authority or otherwise excuses the *student* from adhering to Middlebury's conduct standards is absurd.

The language in the Release relied on by Plaintiff offers no support for his claim that Middlebury intended—by way of a Release inuring to its own benefit—

to pardon student misconduct that occurs while the student is abroad and to bind

itself to the disciplinary decisions of an unrelated institution.  In signing the

Release, Plaintiff made the following acknowledgment:

> I understand that my participation in the Program will be subject to
> the standards of behavior and academic requirements of the
> sponsoring U.S. institution and any host institution.  I recognize that it
> is my responsibility to familiarize myself with all such standards and
> requirements and I understand that if I fail to comply with such
> standards and requirements I may be subject to discipline, up to and
> including dismissal from the Program.

App. at 176.

Like the Pre-Departure Handbook, the Release contains no "specific and

concrete" statement limiting the application of Middlebury's broad authority under

either its Sexual Misconduct Policy or Community Standards Policy.  *Knelman*,

570 F. App'x at 67.  The quoted section of the Release serves a simple and

straightforward purpose—to ensure that students understand and acknowledge that

they must abide by the standards of the externally sponsored program and that they

may be subject to discipline by the program for any violation thereof.  It in no way

follows from this language that the student is relieved of his or her obligation to

respect Middlebury's conduct policies, or that Middlebury forfeited its ability to

enforce its own disciplinary policies.  Since both the externally sponsored program

and Middlebury have a substantial interest in ensuring a safe and secure academic

environment, it is entirely reasonable that both have authority to investigate and

discipline a student based on conduct that occurs while the student is enrolled in the external program. This interpretation, unlike that offered by Plaintiff, comports with the bedrock principle that provisions are not interpreted in isolation—instead, courts must "consider the whole instrument and construe it in harmony if possible with the rest of the contract." *Rogers v. Wells*, 808 A.2d 648, 651 (Vt. 2002) (quotation omitted).

Thus, as a matter of law, the Release has no impact on Middlebury's authority to enforce its own conduct policies and standards. To the extent the District Court concluded otherwise in issuing the preliminary injunction, it erred as a matter of law.

> ### 4. Middlebury's Handbook Governing Its Own Study Abroad Programs Provides No Support for Plaintiff's Contract Claim.

Plaintiff also argued that Middlebury's C.V. Starr Schools Abroad Handbook ("C.V. Starr Handbook"), which applies only to study abroad programs administered by the College, eliminates its authority to investigate claims of misconduct that occur while a student attends an externally sponsored study abroad program. App. at 205-250. This argument is specious. First and foremost, the C.V. Starr Handbook by its terms applies only to Middlebury-sponsored programs. *Id.* at 210. It has no force or effect in the context of a student attending an

externally sponsored study abroad program, and it is therefore irrelevant to this case.

Second, the specific language Plaintiff relied on from the C.V. Starr Handbook does not alter the College's authority to discipline a Middlebury student for conduct committed during participation in an externally sponsored program. The section by its terms is limited to participation by a Middlebury or non-Middlebury student in a Middlebury sponsored program: "where a student is found responsible for a policy violation while participating in any Middlebury Schools Abroad program, the finding of responsibility may also be referred to the appropriate authority overseeing the student's home institution or any additional Middlebury or non-Middlebury program in which the student is or will be enrolled for other action as deemed appropriate." *Id*. at 226. This unremarkable language simply provides that if a student attending a Middlebury study abroad program is found responsible for misconduct *by Middlebury*, that finding will be reported to the student's home institution or any other program in which the student is or will be enrolled for appropriate action—it says nothing as to the student's home institution's authority to investigate allegations of misconduct. Unsurprisingly, the C.V. Starr Handbook does not purport to dictate or restrict what action a student's *home institution* may take based on allegations of misconduct while

26

attending Middlebury's study abroad programs—indeed, Middlebury plainly would have no authority to do so.

Therefore, Plaintiff's reliance on the C.V. Starr Handbook is misguided and, to the extent the District Court relied on it in issuing the preliminary injunction, it erred as a matter of law.

## II. THE DISTRICT COURT ERRED IN FINDING THAT PLAINTIFF WOULD LIKELY SUFFER IRREPARABLE HARM IN THE ABSENCE OF A PRELIMINARY INJUNCTION.

The District Court committed clear error in finding that Plaintiff would likely suffer irreparable harm in the absence of a preliminary injunction. The Court rested its finding on the fact that, without an injunction, Plaintiff might: (1) lose a job offer he secured that is contingent on completion of his degree; (2) be unable to graduate with his class; (3) experience a delay in completing his degree; and (4) suffer harm as a result of his need to explain the gap in his education in the future. *Id*. at 255-56. None of those factors, even in the aggregate, satisfies the high standard for demonstrating irreparable harm. Furthermore, the District Court's decision would allow nearly any student expelled from a college or university to satisfy the "irreparable harm" standard articulated in the decision, thereby making the issuance of preliminary injunctions in these cases routine.

Harm that can be adequately remedied either by money damages or a later-issued permanent injunction is not irreparable. *Loveridge v. Pendleton Woolen*

27

*Mills, Inc*., 788 F.2d 914, 918 (2d Cir. 1986); *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). Furthermore, a preliminary injunction may not issue where the alleged injury is "remote or speculative," *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005), but is instead reserved for cases where the harm is "certain and imminent." *Wisdom Imp. Sales Co. v. Labatt Brewing Co*., 339 F.3d 101, 113 (2d Cir. 2003).

Each potential injury the District Court identified here falls well short of irreparable harm. Even assuming that delayed graduation would cause Plaintiff to lose his job offer, loss of income, harm to reputation and increased challenges finding employment do not rise to the level of irreparable injury as defined by the law. *See Sampson v. Murray*, 415 U.S. 61, 89 (1974) (holding that "loss of earnings or damage to reputation" do not constitute irreparable harm); *Guitard v. United States Sec'y of Navy*, 967 F.2d 737, 742 (2d Cir. 1992) ("[I]njuries that generally attend a discharge from employment—loss of reputation, loss of income and difficulty in finding other employment—do not constitute the irreparable harm necessary to obtain a preliminary injunction."). Lost wages and salary are routinely redressed by money damages in cases ranging from personal injury to wrongful termination claims. Thus, even if Plaintiff were to prevail in this suit, there is no reason that an award of money damages for the value of lost employment compensation would be inadequate.

28

Nor does a mere delay or interruption in one's education rise to the level of irreparable harm. *See Baer v. National Bd. of Medical Examiners*, 392 F. Supp. 2d 42, 49 (D. Mass. 2005) (holding that a person's "inability to continue as a medical student without interruption at Drexel, while desirable, is not a harm that is irreparable to [a person's] potential medical career"). Similarly, the District Court's determination that a gap in Plaintiff's academic record will stigmatize him throughout his professional life is too speculative to satisfy the irreparable harm requirement. *See Caiola v. Saddlemire*, No. 3:12-CV-00624 (VLB), 2013 WL 1310002, at *2 (D. Conn. Mar. 27, 2013) (rejecting as "speculative" the argument that the "stigma of [the plaintiff's] expulsion [would] interfere with his academic and teaching career" and cause irreparable harm); *Stockstill v. Quinnipiac Univ.*, No. 3:10-CV-265 (VLB), 2010 WL 2011152, at *5 (D. Conn. May 19, 2010) ("[The plaintiff's] contention that missing classes for one semester will impede his future educational and career opportunities is purely speculative."); *Ben-Yonatan v. Concordia Coll. Corp.*, 863 F. Supp. 983, 986 (D. Minn. 1994) (rejecting as "purely speculative" student's claim "that, in the absence of injunctive relief, she may never be admitted into medical school due to a one year break in her academic record").

The precedent established by the District Court's ruling threatens to substantially undermine the ability of educational institutions to maintain and

29

enforce disciplinary standards. Many of the concerns cited by the District Court in finding a risk of irreparable harm are common to nearly all instances of expulsion or suspension. Such discipline invariably results in a gap in the student's academic record, prevents the student from graduating with his or her classmates, and poses some risk that the student's graduate school or job prospects could be harmed. If those factors are sufficient to establish the irreparable harm requirement, preliminary injunctions requiring reinstatement of suspended or expelled students would become commonplace, and would frustrate some of the core responsibilities of any college or university—promoting good citizenship and campus safety, and enforcing student conduct standards. *Russell v. Salve Regina Coll.*, 890 F.2d 484, 489 (1st Cir. 1989), *rev'd on other grounds*, 499 U.S. 225 (1991) ("There can be no doubt that courts should be slow to intrude into the sensitive area of the student-college relationship, especially in matters of curriculum and discipline.").

The District Court committed clear error in finding that Plaintiff would likely suffer irreparable harm in the absence of a preliminary injunction.

## III.    THE PRELIMINARY INJUNCTION IMPOSES SUBSTANTIAL HARDSHIP ON MIDDLEBURY.

The District Court wrongly discounted the hardship that the preliminary injunction imposes on Middlebury and clearly erred in finding that the balance of hardships tips decidedly in Plaintiff's favor.

Requiring Middlebury to reinstate a student found to have sexually assaulted another student undermines the College's ability to promote safety and security on its campus.  After an extensive investigation, Plaintiff was found to have forcibly raped another student.  Given that finding, Middlebury reasonably concluded that expulsion was necessary to preserve campus safety and promote an appropriate educational environment.  Compelling Middlebury to allow Plaintiff to return to school without first reaching a decision on the merits of his lawsuit unjustifiably intrudes on that critical responsibility of the College.

The hardship to Middlebury caused by the preliminary injunction is identical to that discussed in *Stockstill v. Quinnipiac University*, No. 3:10-cv-265(VLB), 2010 WL 2011152, at *12 (D. Conn. May 19, 2010).  There, a student whose admission had been revoked based on off-campus sexual misconduct sought a preliminary injunction.  The court found that the student failed to establish that the "balance of hardships tipped decidedly in his favor," explaining that:

> Quinnipiac has a responsibility to all of its students and to the community at large, not just to the Plaintiff. There are thousands of students attending Quinnipiac. *Permitting a student to matriculate when he may pose a danger to other students is a greater harm than the harm caused to the Plaintiff* by rescinding his admission and causing him to miss one semester of classes.

*Id.* (emphasis added). Such is the case here as well, and it compels the conclusion that the hardship Plaintiff would face in the absence of a preliminary injunction is *not* "decidedly" greater than Middlebury's competing interests.

31

Middlebury has a compelling interest in maintaining standards of student conduct through use of its own procedures without unwarranted judicial intervention. As the District Court acknowledged, "colleges have a difficult role in dealing with allegations of sexual assault." App. at 258. If Middlebury is ultimately successful in this case, the preliminary injunction will have unjustifiably intruded on Middlebury's authority to manage its internal disciplinary affairs according to its established policies.

Although the District Court briefly acknowledged those concerns, it diminished Middlebury's interests based on two clearly erroneous findings. *Krizek v. Cigna Grp. Ins.*, 345 F.3d 91, 99 (2d Cir. 2003) ("A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."). First, the District Court inferred that "Middlebury does not view Plaintiff as a threat to the Middlebury community" because he was permitted to attend classes while the College's investigation was underway. App. at 258. The fact that Plaintiff was permitted to continue his studies while the investigation was being conducted in no way undercuts the College's stated safety concerns. During the pendency of Middlebury's investigation, there had been no finding as to Plaintiff's culpability, and, under the circumstances, removing him from campus would have been premature. Indeed, one can only imagine the speed with which a

32

lawsuit would have ensued had Middlebury taken such an approach. The situation materially changed, however, when both an investigator and impartial adjudicator found, by a preponderance of the evidence, that Plaintiff had forcibly raped Jane Doe. Thus, there is no small irony in the District Court's analysis—which seems to suggest that Middlebury should have immediately expelled Plaintiff without conducting any investigation—given Plaintiff's argument that the College's decision to commence an investigation was unlawful.

Second, the District Court found that Plaintiff is not a safety threat because there is no evidence that he has had "further incidents" since returning to Middlebury. *Id.* at 258. This finding is perplexing, to say the least. Middlebury found that Plaintiff forcibly raped a fellow SIT student. Given that finding, the District Court's statement that "there is no indication Plaintiff poses a current threat to campus safety" because there was no evidence that he committed *another* sexual assault in the meantime is clearly erroneous.

The District Court erred in finding that the balance of hardships tips decidedly in Plaintiff's favor.

## CONCLUSION

The District Court's ruling does not withstand scrutiny. Middlebury's decision to investigate and discipline Plaintiff was authorized by its policies. In an effort to manufacture an ambiguity where none exists, Plaintiff's breach of contract

33

claim relied on material irrelevant to Middlebury's disciplinary authority in this case, and the District Court improperly accepted Plaintiff's allegations in that regard at face value without independent analysis. As such, the District Court erred as a matter of law in concluding that "serious questions" exist as to Plaintiff's breach of contract claim. The District Court also erred in finding that Plaintiff would suffer irreparable harm in the absence of an injunction. Finally, the District Court improperly diminished the interests of the College when it found that the balance of hardships tips decidedly in Plaintiff's favor, which was also reversible error.

For all of those reasons, the order of the District Court granting the preliminary injunction should be vacated.

DATED at Burlington, Vermont, this 14th day of October, 2015.

/s/ Ritchie E. Berger
Ritchie E. Berger, Esquire
Karen McAndrew, Esquire
DINSE, KNAPP & McANDREW, P.C.
209 Battery Street
Burlington, VT 05402-0988
(802) 864-5751
rberger@dinse.com
kmcandrew@dinse.com
ATTORNEYS FOR APPELLANT

**CERTIFICATE OF COMPLIANCE WITH**
**TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS,**
**AND TYPE STYLE REQUIREMENTS**

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7,775 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii)e.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 2010 (Standard) in Times New Roman 14-point font.

Dated: October 14, 2015                     _____/s/ Ritchie E. Berger_____
                                            Ritchie E. Berger, Esquire

35

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 14, 2015, I served the foregoing Appellant's Brief on the following counsel of record, by causing it to be filed electronically via the CM/ECF filing system and by causing one copy to be sent by U.S. Mail to:

Lisa B. Shelkrot, Esq.
Langrock Sperry & Wool, LLP
210 College Street
PO Box 721
Burlington VT 05402-0721
lshelkrot@langrock.com

Monica Shah, Esq.
Naomi Shatz, Esq.
Zalkind Duncan & Bernstein LLP
65a Atlantic Avenue
Boston, MA 02110
mshah@zalkindlaw.com
nshatz@zalkindlaw.com

Dated: October 14, 2015

    /s/ Ritchie E. Berger
Ritchie E. Berger, Esquire